NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

STATE OF FLORIDA,                        )
                                         )
          Appellant,                     )
                                         )
v.                                       )    Case No:  2D14-1569
                                         )
JAMES LEACH,                             )
                                         )
          Appellee.                      )
                                         )

Opinion filed May 8, 2015.

Appeal from the Circuit Court for Sarasota
County; Donna Padar Berlin, Judge.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Katherine Coombs Cline,
Assistant Attorney General, Tampa, for
Appellant.

Howard L. Dimmig, II, Public Defender,
and Clark E. Green, Assistant Public
Defender, Bartow, for Appellee.


WALLACE, Judge.

          The State of Florida appeals a circuit court order granting James Leach's

motion to suppress statements and physical evidence based on an alleged improper

detention.  Because the law enforcement officers involved had a reasonable suspicion

sufficient to justify Mr. Leach's detention, which did not become a premature arrest

when he was handcuffed briefly while waiting for an eyewitness to arrive at the scene, we reverse the circuit court's order.

## I.  THE FACTS

On April 5, 2013, at approximately 10:30 p.m., a citizen saw a man break into a work truck parked at a business near the intersection of Warfield Avenue and Cypress Avenue in Venice, Florida.  Gregory Liedke owned the business, and the truck was assigned to his employee, Donald Coup.  Upon witnessing the man break into the truck, the citizen called 911, reported the break-in while it was still in progress, and informed the 911 operator that the perpetrator was carrying a white bucket and was leaving the scene in a newer-model, "fancy," white automobile.  The citizen informant also described the perpetrator as a white male, fifty to sixty years old, and slightly overweight.  Based on this report, the 911 operator arranged for the issuance of a BOLO ("be-on-the-lookout" alert) with the pertinent information.

Officer Alec Gregoire of the Venice Police Department was patrolling the area with Officer Walker.  The two officers responded to the BOLO and immediately went to the location of the business where the break-in had been reported.  Finding no one, the officers circled the block.  A few minutes after the initial report, about one-quarter of a mile from the scene of the break-in, the officers saw a 2005 white Chrysler 300[1] at an auto repair business located in an industrial area.  The Chrysler was parked "on the easement" and "in the driveway," perpendicular to the other cars parked at the business.  The auto repair business and other nearby businesses were closed for the

---

[1]Although the car was approximately eight years old, it was apparently well-maintained and appeared to be relatively new.

evening; there were no people around, and there was very little traffic. The officers' attention was drawn to the Chrysler because of the odd manner in which it was parked and its resemblance to the car described in the BOLO.

The officers stopped to investigate. Immediately, they saw Mr. Leach crouching behind the Chrysler. Both officers drew their pistols; Officer Gregoire repeatedly commanded Mr. Leach to stand up and show his hands. Mr. Leach did not move from his crouching position until after Officer Gregoire had warned him approximately seven times. Finally, Mr. Leach stood up, and the officers could see that he—like his automobile—matched the description given in the BOLO. The officers handcuffed Mr. Leach for their safety and detained him pending a further investigation.

The officers continued to hold the handcuffed Mr. Leach while waiting for the man who had witnessed the break-in at the remodeling business to be transported to the scene for a show-up identification. In the interim, the officers read Mr. Leach his Miranda[2] rights and asked him what he was doing at the auto repair business. Mr. Leach explained that he was driving from his mother's home in Venice to his home in Sarasota and that he had stopped at the auto repair shop to urinate. However, the area where Mr. Leach claimed to have urinated showed no evidence of moisture.

Meanwhile, Mr. Liedke and Mr. Coup had arrived at their business and had confirmed that their truck had been broken into and reported several tools missing from the truck. At the location where Mr. Leach was being detained, the officers observed that the windows of Mr. Leach's car were open. Through the open windows, the officers could see a white bucket and several tools in the back seat area of the car.

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

A few minutes after Mr. Leach had been detained, the witness arrived and immediately identified Mr. Leach as the man he had seen breaking into the truck at Mr. Liedke's business. The officers arrested Mr. Leach at 10:59 p.m. Thus the entire sequence of events from the initial report of the incident until the officers placed Mr. Leach under arrest took approximately thirty minutes.

The Chrysler driven by Mr. Leach was towed to the police impound lot. Mr. Coup came to the police department and identified the items recovered from the car as the same tools that had been taken from his truck. Accordingly, the State charged Mr. Leach with the burglary of an unoccupied conveyance in violation of sections 810.02(1) and 810.02(4)(b), Florida Statutes (2012), a third-degree felony.

## II. THE TRIAL COURT'S RULING

Mr. Leach filed a motion to suppress "all tangible items of property, admissions, and other evidence seized by the police during and after an unlawful and unreasonable search and seizure of an automobile he had legally parked." At the hearing on the motion to suppress, the State called Officer Gregoire as its only witness; the defense did not call any witnesses. Thus the facts presented to the circuit court were substantially undisputed. At the hearing, as he does on appeal, Mr. Leach relied primarily on Baggett v. State, 849 So. 2d 1154 (Fla. 2d DCA 2003). The State relied primarily on State v. J.T., 132 So. 3d 331 (Fla. 4th DCA 2014), and Studemire v. State, 955 So. 2d 1256 (Fla. 4th DCA 2007).

The trial judge took the matter under consideration for a couple of days and then announced her ruling as follows:

> In reviewing the case law provided to the Court, based upon me accepting the officer's testimony as the facts

of this case and [defense counsel's] concession on behalf of the Defense that this was a citizen informant reporting so there isn't as high a threshold, the burglary alone in the description, I do not think provided the sufficient—whether you call it reasonable suspicion or probable cause—for the officers to then draw out their guns and detain them [sic] for the length of time that they did, whether it was for loitering or prowling, but for the burglary in this case which is what the State was proceeding on.

. . . .

So based upon [the BOLO] at this point, while that was enough to get the officers going and approaching and everything that they did, by the time that they got to Mr. Leach, and I do accept the State's argument that they reached him within a short period of time in a smaller temporal proximity, but at that point, the gun drawn, the handcuffs on, I don't believe there was probable cause to detain him for the burglary at that point. So I will go ahead and grant [the motion].

The circuit court did not make any additional findings in its written order granting Mr. Leach's motion to suppress. This appeal followed.[3]

### III. THE STANDARD OF REVIEW

We employ a mixed standard of review in considering the circuit court's ruling on Mr. Leach's motion to suppress. The circuit court's determination of historical facts enjoys a presumption of correctness and is subject to reversal only if it is not supported by competent, substantial evidence in the record. See E.B. v. State, 866 So. 2d 200, 202 (Fla. 2d DCA 2004). However, the circuit court's determinations on mixed questions of law and fact and its legal conclusions are subject to de novo review. See

---

[3]We have jurisdiction of the State's appeal in accordance with Florida Rule of Appellate Procedure 9.140(c)(1)(B).

Ornelas v. United States, 517 U.S. 690, 699 (1996); Connor v. State, 803 So. 2d 598, 608 (Fla. 2001); E.B., 866 So. 2d at 202.

## IV.  DISCUSSION

### A.  *The Validity of Mr. Leach's Initial Detention*

We begin our analysis by considering whether the information provided by the citizen informant and the other pertinent circumstances gave Officers Gregoire and Walker a reasonable suspicion sufficient to justify their initial investigative stop of Mr. Leach.  The trial court apparently concluded that the officers' initial stop of Mr. Leach was justified.  We agree.  In determining this question, we look to the totality of the circumstances.  United States v. Arvizu, 534 U.S. 266, 273 (2002) (noting that reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing" (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981))).

Here, the BOLO to which the officers responded described an older, heavyset, white male who had broken into a work truck at a remodeling business and had driven away in a newer, white automobile.  Granted, the description of the perpetrator of the break-in was sketchy and amounts to a vague description that would fit many individuals.  Nevertheless, the other pertinent circumstances known to the officers when they decided to make the initial investigative stop of Mr. Leach provided a much more complete picture.  First, the time elapsed between the incident under investigation and the officers' response was very brief.  Second, the incident occurred after normal hours in a business or industrial area where there were no other people around and very little traffic.  Third, the officers encountered Mr. Leach within

- 6 -

approximately one-quarter mile of the site of the reported break-in. Fourth, when the officers saw Mr. Leach, he was trying to conceal himself behind a car. Fifth, Mr. Leach's car matched the description of the car in the BOLO. Sixth, Mr. Leach's car was parked at an odd angle in the parking lot of an auto repair business that was closed for the day. Finally, Mr. Leach initially refused the officers' repeated commands to stand up and show his hands.

Clearly, the totality of the foregoing circumstances gave Officer Gregoire and Officer Walker reasonable suspicion to believe that Mr. Leach was engaged in illegal activity. See State v. Augustyn, 490 So. 2d 104, 106 (Fla. 2d DCA 1986) (holding that the temporal proximity between the tip, the police response, and the sighting of the suspect was "[o]f crucial significance" to the determination of reasonable suspicion, and also noting that the location was not densely populated, "making it more reasonable to be suspicious of the van"); Austin v. State, 640 So. 2d 1247, 1248-49 (Fla. 5th DCA 1994) (noting that factual information provided by a known informant that is imperfect can still be sufficient under the totality of the circumstances to provide an officer with reasonable suspicion (citing State v. Evans, 620 So. 2d 802, 803 (Fla. 2d DCA 1993))); see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); Florida v. Rodriguez, 469 U.S. 1, 6 (1984) ("Respondent's strange movements in his attempt to evade the officers aroused further justifiable suspicion . . . ."). Applying the law to the facts of this case, we conclude that the officers had ample justification to suspect that Mr. Leach was involved in criminal activity and to

detain him briefly in order to make a further investigation. See Wardlow, 528 U.S. at 125.

On the issue of the validity of the officers' initial stop, we conclude that Baggett, the case upon which Mr. Leach primarily relies, is easily distinguishable on its facts. The Baggett court held that neither the citizen informant's tip nor the officer's subsequent observations was "suggestive of any criminal conduct or linked Baggett to any burglaries or to any [suspicious] vehicle." 849 So. 2d at 1156-57. Under these circumstances, the court held that "the stop of Baggett was not justified because the circumstances did not create a reasonable suspicion that Baggett was involved in criminal activity." Id. at 1157. By contrast, in this case, both the informant's tip and the officers' subsequent observations strongly pointed to Mr. Leach as a suspect in the recent vehicle break-in.

We note the trial judge's comments about the officers' actions in drawing their pistols when they initially confronted Mr. Leach. Under the particular circumstances present here, we believe that it was reasonable—if not required by police procedures—for the officers to draw their weapons. The officers were facing a felony suspect who was hiding behind a car at night in the parking lot of a closed business. The officers could not determine whether or not the suspect was armed. Leaving their weapons holstered while they reiterated their commands that Mr. Leach stand up and show his hands would have put the officers at an unnecessary risk. See Saturnino-Boudet v. State, 682 So. 2d 188, 191 (Fla. 3d DCA 1996) ("[T]he officer may detain the

- 8 -

individual even at gunpoint and/or by handcuffs for the officer's safety without converting the Terry[4] stop into a formal arrest.").

## B. The Duration of the Stop and the Use of Handcuffs

We now turn to a consideration of the length of Mr. Leach's detention and the officers' use of handcuffs to restrain him. The trial court apparently concluded that the length of Mr. Leach's detention and the officers' use of handcuffs converted a stop that was valid at the beginning into an illegal detention. We disagree. The first question that we are called upon to determine is whether the detention of Mr. Leach for a few minutes while the officers waited for the citizen informant to travel to the scene for a show-up identification was justified.

> Certain constraints on personal liberty that constitute "seizures" for purposes of the Fourth Amendment may nonetheless be justified even though there is no showing of "probable cause" if "there is articulable suspicion that a person has committed or is about to commit a crime." Such a temporary detention for questioning . . . is reviewed under the lesser standard enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and is permissible because of the "public interest involved in the suppression of illegal transactions in drugs or of any other serious crime."

Rodriguez, 469 U.S. at 5 (citation omitted).

Here, Officer Gregoire and Officer Walker had a well-founded suspicion that Mr. Leach was involved in the break-in of the truck at the remodeling business a short distance from their location. Mr. Leach's explanation for his presence in the parking lot of the closed business was doubtful at best and could not be verified. Under these circumstances, holding Mr. Leach for a few minutes to allow an eyewitness to

---

[4]Terry v. Ohio, 392 U.S. 1 (1968).

- 9 -

come to the scene and confirm whether or not Mr. Leach was the perpetrator of the vehicle break-in was entirely reasonable. See State v. Merklein, 388 So. 2d 218, 219-20 (Fla. 2d DCA 1980) (holding that it was reasonable to detain the defendants for twenty to forty minutes pending the arrival of another officer, the robbery victim, and witnesses where the defendants and their automobile fit the radio description of two attempted armed robbery suspects); Fernandez v. State, 57 So. 3d 915, 917 (Fla. 3d DCA 2011) ("[T]he detention was brief and was limited to the sole purpose of allowing the victims to be transported to where the defendant was being detained to conduct show-up identifications. . . . [W]e reject the defendant's contention that the police officer exceeded the scope of the temporary detention."); Saturnino-Boudet, 682 So. 2d at 191 (rejecting the defendant's argument that his detention lasting thirty to forty minutes pending the arrival of a canine unit was the de facto equivalent of an arrest without probable cause); Bilinski v. State, 463 So. 2d 424, 425 (Fla. 3d DCA 1985) ("The defendants were not unlawfully in custody when they were identified by the eyewitness at a prompt on-the-scene police show-up . . . ."). It is worth remembering that in most scenarios such as the one in this case, the failure of the witness to identify a suspect paves the way for the detainee's prompt release.

Moreover, the officers' decision to handcuff Mr. Leach while they waited for the witness to arrive did not convert a valid investigatory detention into a custodial arrest. See Reynolds v. State, 592 So. 2d 1082, 1084 (Fla. 1992) ("Courts have generally upheld the use of handcuffs in the context of a Terry stop where it was reasonably necessary to protect the officers' safety or to thwart a suspect's attempt to flee."); Studemire, 955 So. 2d at 1257 ("The use of handcuffs does not automatically

turn an investigatory stop into a de facto arrest."); <u>Saturnino-Boudet</u>, 682 So. 2d at 191 (same). Here, Mr. Leach's attempt to conceal himself, his initial refusal to obey the officers' commands while they were pointing pistols at him, and his proximity to a car into which he might reach for a weapon or that he might use as a means of escape raised reasonable concerns for the officers' safety and the possibility that Mr. Leach might attempt to flee. Under the circumstances, it was reasonable for the officers to handcuff Mr. Leach during the brief, investigative detention while they waited for the witness to arrive.

## V. CONCLUSION

To summarize, we hold that the officers' initial detention of Mr. Leach was supported by reasonable suspicion. The detention was not converted into a premature arrest either by the relatively brief duration of the detention or the officers' decision to place Mr. Leach in handcuffs while waiting for the eyewitness to arrive. For these reasons, the circuit court erred in granting Mr. Leach's motion to suppress. We reverse the order granting the motion to suppress, and we remand this case to the circuit court for further proceedings consistent with this opinion.

Reversed and remanded for further proceedings.

KHOUZAM and SLEET, JJ., Concur.